*C. L. Cowart* and *H. H. Elders,* for defendants.

---

## HOWELL v. THE STATE.

1. Section 4 of the act of August 16, 1924, known as the electrocution act, does not contain matter different from what is expressed in the title of the act, and is not unconstitutional upon the ground that it violates art. 3, sec. 7, par. 8, of the constitution of this State, which provides that "No law or ordinance shall pass which refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof."

2. The language, "within the walls of the State Penitentiary at Milledgeville, Georgia," in section 1 of said act, means the State Prison Farm located near Milledgeville; and the language, "There shall be present at such execution the warden of the penitentiary," in section 4 of said act, means any warden of said prison, and embraces the superintendent of said prison, who is the warden of the male camp of said penitentiary.

3. Those two sections of said act are not so vague and indefinite as to render them null and void.

4. The defendant is not being deprived of his life without due process of law, and in violation of the due-process clauses of the State and Federal constitutions.

5. The judge did not err in refusing to set aside the sentence.

No. 5809. APRIL 20, 1927. REHEARING DENIED MAY 3, 1927.

Petition to set aside sentence for murder. Before Judge Mathews. Houston superior court. December 4, 1926.

At, 5 C. J. p. 1423, n. 56; p. 1424, n. 57, 62; p. 1425, n. 64, 66, 67.
Constitutional Law, 12 C. J. p. 1209, n. 74 New.
Criminal Law, 16 C. J. p. 1357, n. 34 New; p. 1379, n. 81 New, 1.
Statutes, 36 Cyc. p. 969, n. 91; p. 1025, n. 8; p. 1035, n. 52.

*W. A. McClellan* and *Walter DeFore,* for plaintiff in error.

*George M. Napier, attorney-general, Charles H. Garrett, solicitor-general, T. R. Gress, assistant attorney-general,* and *J. E. Hall,* contra.

HINES, J.   On June 17, 1925, Howell was convicted of murder, without recommendation, and was sentenced to be electrocuted on August 6, 1925.   He made a motion for a new trial, which was overruled.   He thereupon brought his case to this court, to review the judgment overruling his motion for a new trial.   The judgment of the trial court was affirmed by this court.   *Howell* v. *State,* 162 *Ga.* 14 (134 S. E. 59).

On September 15, 1926, Hon. H. A. Mathews, judge of Houston superior court, passed an order fixing a new date for his execution on October 5, 1926.   Howell alleges that this order was not signed in term time, but in vacation, when Houston superior court was not in session, and in his absence when confined in the jail of Bibb County.   During the November term, 1926, of Houston superior court, being the first term of said court to be held after the order of September 15, 1926, Howell presented to said judge his motion to set aside the sentence imposed upon him, on several grounds. Additional grounds were added to this motion by two amendments.

On December 4, 1926, sentence was again imposed upon the defendant, when he was present.   To the imposition of this sentence he objected and moved to set it aside upon the same grounds and for the same reasons as set up and urged in his said motion as amended.   His counsel in their briefs state that in view of this new sentence imposed upon the defendant, many of the questions raised in the original motion to set aside "have been eliminated, and the main questions for" consideration by this court "are those raised in the two amendments to the original motion."   These grounds are substantially: (a) that said last sentence is null and void, for the reason that it directs that the defendant be electrocuted by the warden of the penitentiary, who shall serve as executioner, when under the law, and as a matter of fact, there is no such person or official, as the warden of the penitentiary; (b) that said sentence is null and void, in that it condemns defendant to death at the hands of an alleged person or official, when there is no such person or official, and it is therefore incapable of enforcement, and violates art. 1, sec. 1, par. 3 of the constitution of this

State, which provides that "No person shall be deprived of life, liberty, or property, except by due process of law;" (c) that for the same reason said sentence violates the fourteenth amendment to the constitution of the United States, which declares, "nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws;" (d) that section 4 of the act of August 16, 1924 (Acts 1924, p. 195), is unconstitutional and void, because for the same reasons it violates the due-process clauses of the State and Federal constitutions above set out; (e) that said section of said act is unconstitutional and void, because it contains matter different from what is expressed in the title of said act, in that the title makes no reference to any provision designating any person who shall act as executioner, and is not sufficiently broad to include the conferring of power in its body upon the alleged person designated therein to serve as executioner, in consequence of which it violates art. 3, sec. 7, par. 8 of the constitution of this State, which provides: "No law or ordinance shall pass which refers to more than one subject-matter or contains matter different from what is expressed in the title thereof;" (f) that said sentence is null and void, in that it condemns the defendant to be electrocuted at the State Penitentiary at Milledgeville, Georgia, or wherever the State Penitentiary may be located, and within the walls of said penitentiary, on the date named, when in fact the State Penitentiary is not located at Milledgeville, as the institution located near there is only the State Farm, as the convict camps of the counties of the State are parts of the State Penitentiary, if there is one, and as the State Penitentiary, if there be one, is therefore located at no particular place; and that it violates the due-process clauses of the State and Federal constitutions hereinbefore specified; (g) that section 1 of said act provides that all persons convicted after its passage of a capital crime, upon whom the death sentence is imposed, shall suffer punishment by electrocution within the walls of the State Penitentiary at Milledgeville, or wherever the State Penitentiary may be located, instead of hanging, when in fact there is no State Penitentiary at Milledgeville; and it is unconstitutional and void, because it is so vague and indefinite in its terms as to be incapable of enforcement, and for this reason violates the due-

process clauses of the State and Federal constitutions hereinbefore. quoted; and (h) that there is not now, was not when defendant was sentenced, and has not been since said date a State Penitentiary in Georgia, and his sentence condemning him to death at the hands of the warden of the penitentiary, when there is and can be no such person and when there was no such person when he was sentenced, is incapable of enforcement and is a mere nullity, and violates the due-process clauses of the State and Federal constitutions above set out.

On the hearing of the defendant's objections to the imposition of said last sentence, it was agreed that the following resolutions had been adopted by the Prison Commission: "Office of the Prison Commission.    May 10th, 1922.    The Prison Commission having under advisement the filling of vacancy at State Farm, caused by the death of Hon. J. Pope Brown, Superintendent and Warden, it is resolved: (1) That the resolution of September 28th, 1921, recorded on page 153, be rescinded, and that the offices of superintendent and warden be separated. (2) That a superintendent shall be elected for a term ending January 1st, 1923, and annually thereafter for a term of one year. (3) That the deputy wardens of the several departments shall be raised to the position of warden, with all the duties imposed by law and rules of the department. (4) The superintendent shall have charge of the management of the farm, and shall direct its operation. He shall have general supervision over the wardens and employees of the farm, and shall discharge all duties imposed upon him by the resolution of September 28th, 1921, recorded on page 153 of our minutes, except those specially under charge of the warden, such as custody of prisoners and their discipline. (5) The salaries of the superintendent and wardens shall be $100.00 per month. (6) B. H. Dunaway, of Lincoln County, was elected Superintendent. (7) J. E. Smith was elected warden of the male camp. (8) R. N. Etheridge was elected warden of female camp. (9) W. L. Proctor was elected warden of the hospital camp." "Office of the Prison Commission.    Atlanta, Ga., Dec. 20th, 1922.    Whereas R. N. Etheridge, Warden of the Male Camp at State Farm, has resigned effective January 1st, 1923, it is ordered that the office of Warden of said camp be filled by B. H. Dunaway, the Superintendent of the Farm, in addition to his duties as Superintendent, and that his salary as Superin-

tendent and Warden be $1800.00 per annum, beginning January 1st, 1923." It was agreed that B. H. Dunaway has been filling the office of superintendent of the State Prison Farm under the first of the above resolutions, continuously since May 10th, 1922, and that he has filled the office of warden of the male camp at the State Prison Farm under the second of said resolutions, since January 1, 1923.

1. We deal first with the contention that section 4 of the electrocution act of August 16, 1924, contains matter different from what is expressed in the title of that act, and that for this reason this section is unconstitutional, because it violates art. 3, sec. 7, par. 8, of the constitution of this State, which provides that "No law or ordinance shall pass which refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof." The fourth section of this act is as follows: "That there shall be present at such execution the warden of the Penitentiary, who shall serve as executioner, and at least two assistants, two physicians to determine when death supervenes, an electrician, a suitable guard, and, if the condemned person so desires, his counsel, relatives, and such clergymen and friends as he may so desire." Ga. Laws 1924, p. 195. The title of the act provides "for the execution of persons sentenced to the punishment of death, by electrocution," for "a permanent death chamber, . . appliances and apparatus necessary for the proper execution of felons by electrocution," for the appropriation of moneys necessary to defray the expenses thereof; to "authorize the trial judge to fix a new date for the execution of the sentence where the same is not executed on the date originally named; and for other purposes." Clearly these provisions of this section fall within the title of this act. Under the title of an act providing for the execution of persons sentenced to the punishment of death by electrocution, the body thereof can provide for the person who shall execute the condemned convict, for persons to assist the executioner, for the presence of physicians to determine when death ensues, for an electrician to operate the electric appliances necessary for electrocution, for a suitable guard, and for the presence, if the condemned person so desires, of his counsel, his relatives, and such clergymen and friends as he may desire. Besides, the title of the act contains the words "and for other purposes," and

under these words any matters germane to those expressed in the title can be embraced in the body of the act. It is so clear that the title of the act covers the provisions embraced in section 4 that we do not deem it necessary to further discuss this matter or to cite authorities bearing thereon. The mere comparison of the title and the provisions of this section will show that this contention is without merit.

2. The defendant moved to set aside the sentence imposed upon him, providing for his execution by electrocution, upon the ground that it provides that he is to be executed "by the warden of the State Penitentiary," and "within the walls of the . . State Penitentiary at Milledgeville, Georgia," when in fact there is no such person or official as "the warden of the State Penitentiary," and when in fact there is no State Penitentiary at Milledgeville, Georgia, and that in consequence of these facts his sentence is a nullity and his electrocution under this sentence would deprive him of his life without due process of law, and in violation of the due-process clauses of the State and Federal constitutions. We shall deal alone with the premises from which the defendant draws the conclusion that his execution under this sentence would deprive him of his life in violation of the above provisions of the State and Federal constitutions. If these premises are unsound, it necessarily follows that the conclusion drawn therefrom is likewise unsound. The first section of the act of August 16, 1924, provides that all persons convicted, after its passage, of a capital crime, and sentenced to die, "shall suffer such punishment by electrocution within the walls of the State Penitentiary, at Milledgeville, Georgia, or wherever the State Penitentiary may be located, instead of hanging." The defendant contends that there is no State Penitentiary at Milledgeville, Georgia, or elsewhere in this State. Is this contention sound? In answering this question it may be well to determine the meaning of the term "penitentiary." What is a penitentiary? A penitentiary is a prison or place of punishment, especially one in which convicts are confined at hard labor for punishment and reformation. Funk & Wagnalls' New Standard Dictionary of the English Language; Webster's New International Dictionary. It is an English word in common use, and means a place of punishment in which convicts sentenced to confinement and hard labor are confined by au-

14

thority of the law. Bouvier's Law Dictionary, Rawle's 3d Rev.; Miller *v.* State, 2 Kan. 174; State *v.* Nolan, 48 Kan. 723 (29 Pac. 568, 30 Pac. 486). In this State it means any place where felony convicts sentenced to confinement and hard labor are confined by authority of its laws. So in *Campbell* v. *Davison,* 162 *Ga.* 221 (133 S. E. 468), this court held that "A felony convict working in a county of the State upon the public works and roads, under an allotment made to the county by the act of 1908 (Ga. L. 1908, p. 1119), is 'confined in the penitentiary,' and if he escapes from such confinement his escape is from the penitentiary." Here is a distinct ruling that any place where felony convicts are confined at hard labor, under the authority of any law of this State, is a penitentiary. It follows further that there may be many penitentiaries in this State. Under our laws there may be a penitentiary in each county in the State.

Under the sentence imposed upon the defendant, he was to be executed within the walls of the penitentiary at Milledgeville, this State. This sentence was imposed in strict conformity to the first section of the act of August 16, 1924. This brings us to decide whether the State has a penitentiary at Milledgeville. The word "at," as used in this statute, does not mean within the corporate limits of the City of Milledgeville. As used in this statute, it is the equivalent of the word "near." In *Minter* v. *State,* 104 *Ga.* 743 (30 S. E. 989), it was held that an indictment which charged the defendant with disturbing a religious congregation assembled for worship "at" a named church was supported by proof that the congregation was disturbed at a bush-arbor near such church. In *Bice* v. *State,* 109 *Ga.* 117 (34 S. E. 202), it was held that our penal statute which prohibits carrying to a church, or other place of divine worship, any intoxicating liquor, was violated when one attending such exercises at a named church had in his buggy such intoxicating liquor, although the buggy was left standing one or two hundred yards from the church building during the exercises. In *Massey* v. *Columbus,* 9 *Ga. App.* 9, 13 (70 S. E. 263), the Court of Appeals approved a ruling of Judge Gilbert, now an Associate Justice of this court, made by him while a judge of Muscogee superior court, that the word "near" is equivalent to the word "at." The word "at," when used in reference to place, often means "in," or "within;" but its primary idea is "nearness"

or "proximity," and it is commonly used as the equivalent of "near" or "about." 5 C. J. 1423, § 7; *Farmers Cotton Oil Co.* v. *Brooke,* 14 *Ga. App.* 778, 782 (82 S. E. 372). So the word "at," as used in the first section of this act, means "near;" and if the State has a penitentiary near Milledgeville, such penitentiary falls within the meaning of this section.

The Prison Commission is required to use all net profits arising from the State farm in establishing a central penitentiary for the working of such vicious convicts as that body may select. Penal Code, § 1214. In the stipulation of facts, appearing in the bill of exceptions, it is agreed that no central penitentiary has been established at or near Milledgeville, or elsewhere in the State of Georgia. So, when the legislature used the term penitentiary in the first section of this act, it can not be held that it had any reference whatever to any central penitentiary at Milledgeville. We presume, and rightfully presume, in favor of legislative sagacity, that the members of the legislature who passed this act knew that there was no central penitentiary at or near Milledgeville, and had no such institution in mind when it enacted this statute. It would be attributing to the legislature an absurdity to hold that they used the word "penitentiary," in the first section of this act, in the sense of "central penitentiary," when no such institution was in existence. By the act creating the Prison Commission, that body was authorized to purchase not less than 2000 nor more than 5000 acres of land, in one body or in several bodies located in different parts of the State; and when purchased they were re-quired to erect thereon suitable buildings, stockades, and appurte-nances for the safe-keeping of the following classes of convicts: females, boys under fifteen years of age, and such aged, infirm, or diseased convicts as in the judgment of that body should not be hired out. Acts 1907, p. 70; Penal Code, § 1203. From the stipu-lation of facts set out in the bill of exceptions it appears "that the Prison Commission of Georgia, has established a State Prison Farm in Baldwin County, Georgia, near Milledgeville, where the same has been located for several years, and has installed in the main building at said farm an electric chair to be used in all executions of prisoners in this State." It further appears that the present superintendent and warden of this State Prison Farm have been acting as such since January 1, 1923. So, when the

legislature passed the act of 1924, the State had a prison farm near Milledgeville, Georgia, and it follows necessarily when the legislature passed the act of 1924, in which they used the language, "all persons convicted, after the passage of this act, of a capital crime, and have imposed upon them the sentence of death, shall suffer such punishment by electrocution within the walls of the State Penitentiary at Milledgeville, Georgia, or wherever the State Penitentiary may be located, instead of hanging," they had reference to this State Prison Farm, so located and then operated, near the City of Milledgeville. So we are of the opinion that when this act was passed the State had a penitentiary at or near Milledgeville, and that it was this penitentiary to which they referred in the first section of the statute under consideration.

It is further urged that the fourth section of the act prescribes "That there shall be present at such execution the warden of the penitentiary, who shall serve as such executioner;" that in point of fact there was no warden of the penitentiary; and that in consequence of these facts the sentence is unenforceable, for which reason this section of the act, and the sentence imposed upon the defendant in pursuance thereof, are both null and void. Is this contention sound? We think it unsound and untenable. We have seen that there was a State Penitentiary near Milledgeville, for the confinement and punishment of all women convicts, for boys under fifteen years of age, and for old, infirm, or diseased male convicts. The Prison Commission is required to provide for the keeping of the male and female prisoners separate and apart, and for the keeping, separate and apart from the other inmates of the prison, of all minors under the age of fifteen years. So there must be codepartments in the State Prison at Milledgeville. To effectuate this purpose, that body, on May 20, 1922, elected separate wardens for the male, female, and hospital camps. At the same time they elected a superintendent of the State Prison Farm. The warden elected for the male camp resigned, his resignation to take effect on January 1, 1923; and on December 20, 1922, the Prison Commission passed a resolution providing that the office of warden of the male camp should be filled by the superintendent of the farm. From the stipulation of facts it appears that B. H. Dunaway has filled the office of warden of the male camp at the State Prison Farm, under the above resolution, continuously since Jan-

uary 1, 1923. So this officer, since the above date, has been the warden of the male camp of the State Prison Farm. Likewise there had been separate wardens of the female and hospital camps. So there were three wardens in this prison at the time the sentence of death was imposed upon this defendant. Section 4 of the act under consideration provides that at the electrocution of a convict, under sentence of death, "the warden of the Penitentiary" shall be present at his execution and shall act as executioner. It is urged by counsel for the defendant that there exists in fact no warden of the State Prison who was authorized by this section to electrocute a convict under sentence of death. It is insisted that the definite article "the" is used in this section of the act, and definitely designates the person who can execute such a convict. It is urged that "the warden" and not "a warden" shall be present and act as executioner, when in fact there is no such officer or person. We do not think that this contention is sound. In fact we do not think it is plausible. It is true that the word "the" is the definite article, and is the word generally used before nouns with particularizing effect, and as opposed to the indefinite article "a" or "an," and to the generalizing effect of the latter articles. The former particularizes the subject spoken of. It is a demonstrative word used especially before a noun to particularize its meaning, and has a force which thus distinguishes it from the indefinite distributive force of the indefinite article *a* or *an,* and from the abstract force of the unqualified noun. Webster illustrates this matter as follows: "Thus, *the* man, points to a particular man, as distinguished from *a* man and from the generic *man*." This is the general use of the article *the,* but it has various special uses. Among these special uses, it is placed before a noun as denoting what is well known. So we speak of *the* Mississippi, to denote that that river is well known. It is used before a generic noun to indicate it as such. *"The* grasshopper shall be a burden." Eccl. XII, 5. So in the language, "The warden of the penitentiary," in the fourth section of the act of 1924, this word is used to particularize this official from other wardens of the State penitentiary system. When the execution takes place at the prison farm at Milledgeville, some warden of that penitentiary must be the executioner, and the executioner can not be a warden of some other penitentiary of the State. Besides, the word "the" is not

always used to mean but one. In Noyes *v.* Children's Aid Soc. (N. Y.) 3 Abb. N. C. 36, 40, it was said: "'The' (says Dr. Lowth) 'determines what particular thing is meant; i. e., what particular thing we are to assume to be meant.' . . Yet this article is not always used to mean but one. Take the well-worn and well-wearing quotation, 'The man that hath no music in his soul is fit for treason,' etc., the meaning of the article is not exhausted when one man is found with no music in himself. 'The man' means there 'any man.'" By section 4905 of the Civil Code (1910) sheriffs are required, before entering on the duties of their office, to take and subscribe "before the judge of the superior court, or ordinary," the oath embraced in said section. Here the article "the" is used before the noun "judge." It would not be a proper construction of the language, "the judge of the superior court," to hold that in a county, such as Fulton, where there are five superior-court judges, this oath could not be administered to the sheriff by any one of these judges, for the reason that the statute requires this oath to be administered by "the judge," when in fact there was no such judge in Fulton county. This is a familiar illustration of the fact that the article *the,* as used in statutes, is often used in the sense of *any.* We agree with the statement made by Chief Justice Tilghman, in Sharff *v.* Com., 2 Binn. (Pa.) 516, that "Grammatical niceties should not be resorted to without necessity;" and that in some cases "it would be extending liberality to unwarrantable length to confound the articles 'a' and 'the.'" While this is true, it would be carrying grammatical niceties to an extreme to hold that a statute using the article *the* before a noun denoting an official at the penitentiary should be stricken down because there are several officials of the same denomination, no one of whom falls within the particularization indicated by this article when confined to its general use, although it may come within one of its special uses. In the construction of a statute we should apply common sense, and not apply the logical refinement of the schoolmen. So we are of the opinion that the language, "the warden of the Penitentiary at Milledgeville," means any warden of that institution, and especially embraces the superintendent of the entire institution who is likewise the warden of the male camp.

3.   It is likewise contended that sections 1 and 4 of this statute

are so vague and indefinite as to render them null and void. In view of what is said above, this position is not well taken.

4. It follows from the rulings above made that the defendant is not being deprived of his life without due process of law, and in violation of the due-process clauses of the State and Federal constitutions.

5. In view of what is said above, we affirm the judgment of the court below refusing to set aside the sentence imposed upon the defendant.    *Judgment affirmed. All the Justices concur.*

GILBERT, J., concurring specially. I concur in all that is said by my learned associate who speaks for the court. In addition, I deem the following views to be appropriate. Where a person is illegally restrained of his liberty, the remedy is habeas corpus. Yet the great weight of State and Federal authority, including the United States Supreme Court, is that these questions can not be raised even by habeas corpus. In Ex parte Ward, 173 U. S. 452 (19 Sup. Ct. 459, 43 L. ed. 765), it was unanimously decided that a person convicted at a trial presided over by a judge without title to hold office could not be discharged, the judge's power not being open to collateral attack. This case was followed in Dones v. Urrutia, Warden of the Penitentiary of Porto Rico, 202 U. S. 614 (26 Sup. Ct. 767, 50 L. ed. 1172), and in many other State and Federal cases. Morford v. Oklahoma, 54 L. R. A. 513 (10 Okla. 741, 63 Pac. 958) ; Minnesota v. Bailey, 19 L. R. A. (N. S.) 775 (106 Minn. 138, 118 N. W. 676, 130 Am. St. R. 592, 16 Ann. Cas. 338). In these cases it was contended that the presiding judge did not in law hold the office. In the Morford case it was said that "the acts of such officers are held to be valid because the public good requires it. The principle wrongs no one. A different rule would be a source of serious and lasting evils." It would seem that if the acts of the presiding judge could not be collaterally called in question by habeas corpus, certainly those of a warden could not be collaterally attacked in equity.

The Dones case went to the United States Supreme Court from the Supreme Court of Porto Rico. Dones had been convicted of a felony and sentenced to death. He sought release from the custody of the warden, on the ground that the judgment was illegal because the trial court was not legally organized, and because the judge who rendered the judgment was not legally authorized to

try the cause, since his appointment was contrary to a law passed by the legislature. In the opinion of the Porto Rico Supreme Court we find the following: "The second point relied on for the granting of this writ is that Hon. James A. Erwin, the district judge who tried the case of the People of Porto Rico *v* Francisco Dones, in the court of Humacao, and who sentenced him to the death penalty, was not legally and properly appointed, and has no authority to act as such district judge, because he was not, at the date of his appointment by the governor and confirmation by the executive council of Porto Rico, a lawyer authorized to practice in the Supreme Court of this island. . . Under all the authorities, without a break in the current, we find that, even though Judge Erwin were not legally and properly qualified to act as judge, and even if his appointment were not remediable and the defect in his appointment still continued up to the present time, he was at least, if not a judge de jure, a judge de facto; and being such, the judgment rendered by him in this case can not be called in question on habeas corpus." The United States Supreme Court affirmed this judgment.

RUSSELL, C. J., specially concurring. I agree that the judg-' ment of the learned trial judge should be affirmed, but I do not concur in accepting some of the rulings contained in the syllabus of the court as grounds upon which the affirmance should be predicated. In my view of the law, "the warden of the penitentiary," who "shall be present" at an execution by means of electrocution, can not properly be construed to mean "any warden of said prison and embraces the superintendent of said prison." However, I do not think, even if the trial judge based his refusal to interfere with the execution of Howell upon this ground, that this alone should require a reversal of his judgment; for I am of the opinion, as held by the Supreme Court of the United States in passing upon a similar question upon petition for habeas corpus, that the convict is not in a position to object to the disqualification of the judge who imposed sentence upon him; so for the same reason the plaintiff in error in this case can not complain that a de facto executioner is to impose upon him the death penalty. Section 1215 of the Penal Code declares that superintendents "shall be required to give their entire time and attention to the duties of their office." It is therefore important to consider what are the

duties prescribed for the superintendent of the State Farm at Milledgeville. As to this, section 1215 says: "If the Prison Commission has on hand convicts not provided for under the foregoing sections of this article, said Prison Commission may place upon said farms such convicts and work the same thereon. In connection with the handling of convicts upon farms, the Prison Commission shall employ such superintendents as in their discretion may be deemed necessary." Therefore, so far as the duties of the office of the superintendent of the prison farm at Milledgeville are concerned, his duty is to work the convicts that may be placed on said farm, and to that they are required to give their entire time and attention. By the very terms of the section the superintendent has no care or duty as to any convicts except those placed to work upon the farm; and this will certainly not embrace a convict who is sent to the farm, not to work, but to be closely confined and then be executed at the expiration of the short period provided by the act of 1924. Acts 1924, p. 195. I can not agree to the statement in the opinion of the court as to the facts which are therein stated to rest within our judicial knowledge. So far as my judicial cognizance extends, I know that the superintendent of the farm is to be selected and is selected as an expert farmer, and it is a matter of common knowledge that near Milledgeville the Prison Commission, as authorized by law, has purchased several thousand acres of farming land which is cultivated under the superintendence of the superintendent; that there are three distinct prisons containing these hundreds of workers; that not only does the superintendent have the superintendence of all this land with the animals and tools necessary for the conduct of this immense business, but the law further requires that he shall superintend the wardens and guards who are subject to his orders and who are necessary to guard and safely keep this large body of criminal convicts, male and female, adults as well as immature youths. Instead of assuming that the legislature acted upon the grounds and for the reasons stated in the opinion of the court, it is my opinion that the General Assembly were conversant with the foregoing facts (which were matters of common knowledge) when they passed the act of 1920 (Acts 1920, p. 273), in which they expressly created four distinct and separate offices the designation and appellation of each of which clearly indicates distinct and

separate duties for each. These officers are as follows: "superintendent, physician, and warden, . . and bookkeeper," fixing for the superintendent, physician, and warden a salary of $1800 per year for *each,* and for the bookkeeper $1500 per year. It must be assumed that the General Assembly of 1924 was familiar with so recent an act as that of 1920, supra, and it was within their power to have selected a superintendent as the person who should be present and have charge of an electrocution; and so, when instead of selecting the superintendent they selected a warden, I am forced to the conclusion that the superintendent can not de jure execute a convict under death sentence. I cheerfully agree to all that is said in the opinion of the court that *any* warden at any camp where the prison commission had placed the necessary appliances for execution would be *the* warden so far as the person under sentence of death is concerned, but I can not substitute for the word "warden" in the act of 1924, supra, the word "superintendent" when the act expressly says that "the person who shall be present," etc., shall be the *warden* and not the *superintendent.* Under the first section of the act of 1924, supra, it is provided that persons convicted of a capital crime and under sentence of death shall suffer such punishment by electrocution within the walls of the State penitentiary at Milledgeville, until such time as a State penitentiary may be located elsewhere; so there is nothing in the point that the plaintiff in error was to be executed at the wrong place, or that no place had been designated by law. I can not agree that a superintendent of the prison farm is the person designated by law to execute the plaintiff in error, when I am myself convinced that if the mandate of the legislature is obeyed the warden created by the act of 1920 should bear that burden until the lawmakers change the law; but I still think the decision of the judge of the lower court in the case of bar was correct, because I do not think that the plaintiff in error can complain that he was to be executed by a de facto officer rather than by the lawful executioner expressly designated by the act of 1924, supra.